# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| SURESH KUMAR | § | |
| *Plaintiff,* | § | |
| v. | § | Civil Action No.  4:19-CV-00284 |
| | § | Judge Mazzant |
| FRISCO     INDEPENDENT     SCHOOL | § | |
| DISTRICT, ET AL. | § | |
| *Defendants.* | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendants' Motion to Dismiss for Lack of Standing Pursuant to Fed. R. Civ. P. 12(b)(1) (Dkt. #41).  Having considered the motion and the relevant pleadings, the Court finds that Defendants' Motion is **DENIED**, subject to reinstatement, pending Kumar's filing of his Amended Complaint.

## BACKGROUND

The present action concerns allegations of voting rights discrimination brought pursuant to Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, and the Fourteenth and Fifteenth Amendments to the United States Constitution.  Specifically, Plaintiff Suresh Kumar ("Kumar") alleges that, among other things, Frisco Independent School District ("FISD") and its Board of Trustees ("Board") (collectively "Defendants") have instituted an at-large electoral system that "dilutes the voting strength of African Americans, Hispanics, Asians, and other minority voting populations" (Dkt. #23).  Defendants deny all allegations.

Kumar moved from India to the United States in 1994 (Dkt. #23).  He became a United States Citizen in 2006 (Dkt. #23).  In 2014, Kumar, and his family, purchased a home in the City of Frisco and his two daughters were accordingly enrolled in FISD schools (Dkt. #23).  Because of his daughters' enrollment in FISD schools, Kumar states that he developed a "deep personal

interest in the academic success of the school district" (Dkt. #23).  Despite Kumar's interest in the success of FISD, and his hopes for "greater diversity and cultural sensitivity," Kumar avers that he has "watched with concern" as FISD has failed to keep "pace with the demographic changes" it has experienced" (Dkt. #23).[1]

According to Kumar, the Board of Trustees of FISD has, allegedly, failed to adequately represent Kumar and other minorities (Dkt. #23).  The Board's failure to represent Kumar, Kumar continues, is due to the inability of "candidates of color" to win elections; notably, seven candidates of color have purportedly run for the Board since 2015 and all seven candidates have lost (Dkt. #23).  Moreover, Kumar points to the fact that "only one of the seven current [B]oard members lives within the zone established by FISD for the high school that Mr. Kumar's daughter attends" (Dkt. #23).  Additionally, Kumar points out that the Board is comprised of six white Trustees and one minority Trustee (Dkt. #23).  These statistics are not merely coincidences, according to Kumar; rather, these statistics represent the concrete effects of a discriminatory at-large election system (Dkt. #23).

FISD's at-large election system is discriminatory, Kumar maintains, because the system discourages minority participation in the electoral process (Dkt. #23).  More specifically, Kumar argues that:

> Under the current at-large election system, all voters within FISD are permitted to vote on the candidates for every trustee position.  Trustees serve three-year, staggered terms in positions called "Places"—which have no geographic significance.  In other words, elected trustees do not represent any specific territory or sub-district within FISD.  The at-large system discourages minority or minority-preferred candidates from seeking office because

---

[1] According to the Amended Complaint:

> Students of color comprise over 57% of the total student population—current enrollment is 41.6% White, 29.1% Asian, 13.5% Hispanic, 11% African American, 4% Two or More Races, 0.53% American Indian/Alaskan, and 0.09% Hawaiian/Pacific Islander. FISD serves students speaking 71 different languages.  Additionally, 12.53% of FISD students are classified as economically disadvantaged"

(Dkt. #23).

it effectively functions as a White-controlled referendum on all candidates, where a bloc of White voters controls all seven trustee positions.

As a result, the Board sets District policy without the input of or participation from the communities where the majority of students reside. Taken together—the chilling effects of the at-large system and the obvious polarization between the White voters and all others—the current Board fails to reflect the composition of the real stakeholders of the public-school system.

(Dkt. #23). In sum, Kumar contends that Defendants' at-large electoral system, which requires a district-wide plurality for staggered positions, has resulted in a system that is not only "disconnected from the diverse multiethnic, multiracial, and multilingual community," but that has failed to prevent discriminatory actions (Dkt. #23).

Defendants' failure to prevent discriminatory actions has led to "[i]ncidents of overt racism . . . in FISD" and cultural insensitivity according to Kumar (Dkt. #23). For example, according to the Amended Complaint, such racism, or insensitivity, includes African American students being threatened with physical harm if they misbehaved, Latino students being referred to by the Spanish slang term "esé," a Hindu student—Kumar's daughter—being "aggressively" questioned for her absences due to a "13-day Hindu mourning period for her grandmother," and disparate pay for campuses which are comprised of predominantly economically disadvantaged students and/or students of color (Dkt. #23). These are all side-effects, according to Kumar, of a system that both prevents candidates of color from winning seats on the Board and discourages minority participation in the electoral process. To prevent what Kumar views as a discriminatory system from continuing to "dilute the votes of Asian, Hispanic, and African American voters," Kumar, as the sole plaintiff, instituted the present action on April 16, 2019.

On October 17, 2019, Defendants filed Defendants' Motion to Dismiss for Lack of Standing Pursuant to FED. R. CIV. P. 12(b)(1) (Dkt. #41). In their Motion, Defendants aver that Kumar may only represent the Indian (Asian) minority group as he failed to add an African

American, Hispanic, or other minority plaintiff to this action (Dkt. #41). On November 14, 2019, Kumar filed Plaintiff's Opposition to Defendants' Motion to Dismiss for Lack of Standing (Dkt. #48). In his Motion, Kumar counters that he is not asserting third party standing and that there is no authority that requires a named plaintiff for every minority group affected by an alleged violation (Dkt. #48). Finally, on November 21, 2019, Defendants filed Defendants' Reply to Plaintiff's Response to Defendant's Motion to Dismiss for Lack of Standing Pursuant to Fed. R. Civ. P. 12(b)(1) (Dkt. #52). Notably, both in Defendants' Motion and Reply, Defendants maintain that Kumar should be permitted to pursue his claims as they relate to the Indian (Asian) minority group because Kumar has established standing for those claims (Dkt. #23; Dkt. #52). Kumar is only precluded, Defendants continue, from representing minority groups to which he does not belong and has not added a named plaintiff (Dkt. #23; Dkt. #52).

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a case for lack of subject matter jurisdiction when the district court lacks statutory and constitutional power to adjudicate the case. *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). If a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the Court will consider the jurisdictional attack under Rule 12(b)(1) before addressing any attack on the legal merits. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

In deciding the motion, the Court may consider "(1) the complaint alone; (2) the complaint supplemented by the undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the [C]ourt's resolution of disputed facts." *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008) (quoting *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996)). The Court will accept as true all well-pleaded allegations set forth in the complaint and

construe those allegations in the light most favorable to the plaintiff. *Truman v. United States*, 26 F.3d 592, 594 (5th Cir. 1994). Once a defendant files a motion to dismiss under Rule 12(b)(1) and challenges jurisdiction, the party invoking jurisdiction has the burden to establish subject matter jurisdiction. *See Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980). The Court will grant a motion to dismiss for lack of subject matter jurisdiction only if it appears certain that the claimant cannot prove a plausible set of facts to support a claim that would entitle it to relief. *Lane*, 529 F.3d at 557.

## ANALYSIS

The Court is presented with a challenge to Kumar's standing to assert a Voting Rights Act violation on behalf of African Americans, Hispanics, and other minorities as a member of the Indian (Asian) community. Specifically, Defendant's aver that Kumar is impermissibly asserting legal rights and interests of third parties not properly joined to this action. Defendants do not dispute, however, that Kumar is permitted to assert claims on behalf of the minority group—Indian (Asian)—to which he is a member. While the Court recognizes that both parties believe that Kumar has established constitutional standing, the Court must zealously guard against exercising its Article III power over a matter erroneously. Moreover, constitutional standing necessarily affects the prudential standing analysis that the Court must conduct under *Kowalski v. Tesmer*, 543 U.S. 125, 129–130 (2004). As such, the Court will first address whether Kumar has established constitutional standing to assert violations of the Voting Rights Act on behalf of himself. The Court will then proceed to determining whether Kumar is impermissibly asserting the legal rights and interests of third parties not before the Court.

## I. Constitutional Standing

The "judicial Power of the United States" extends only to "Cases" and "Controversies." U.S. CONST. art. III, §§ 1–2. "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976)); *cf. Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) (stating that "a federal court's 'obligation' to hear and decide a case is 'virtually unflagging.'"). The doctrine of standing is "rooted in the traditional understanding of a case or controversy," and it "limits the category of litigants empowered to maintain a lawsuit in federal court . . . ." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citation omitted). So, the Court must decide issues of standing before all other issues because it "determines the court's fundamental power even to hear the suit." *Ford v. NYLCare Health Plan of Gulf Coast, Inc.*, 301 F.3d 329, 332 (5th Cir. 2002).

To establish standing, a plaintiff must have: (1) suffered an injury in fact; (2) that is fairly traceable to the challenged conduct of the defendant; and (3) that is likely to be redressed by a favorable judicial decision. *Spokeo*, 136 S. Ct. at 1547 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). The Supreme Court of the United States has clarified that constitutional standing is limited to this analysis of "Article III's limitation of the judicial power to resolv[e] 'Cases' and 'Controversies.'" *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 112, 125 (2014).

Kumar has established constitutional standing. "Originally, the Voting Rights Act expressly conferred standing only upon the Attorney General." *Veasey v. Perry*, 29 F. Supp. 3d

896, 908–09 (S.D. Tex. 2014) (citing *Roberts v. Wamser*, 883 F.2d 617, 621 (8th Cir. 1989) (footnote omitted)).  In *Allen v. State Board. of Elections*, 393 U.S. 544 (1969), the Supreme Court, finding that the existence of a statutory right necessitated an appropriate remedy, held that aggrieved voters are entitled to enforce the Voting Rights Act's prohibition on invidious racial discrimination.  *Id.* (citing *Roberts*, 883 F.2d at 621).  Congress, recognizing the holding in *Allen*, subsequently amended the Voting Rights Act in 1975 to statutorily grant "aggrieved persons" standing to enforce the Act.  *Id.* (citing *Roberts*, 883 F.2d at 621).  "Aggrieved persons" have been defined as those voters "whose rights have allegedly been denied or impaired." *Id.* (citing *Roberts*, 883 F.2d at 621).  Consequently, "[o]nly the United States Attorney General and 'aggrieved persons' have first party standing to bring Voting Rights Act claims." *Id.* (citing *Roberts*, 883 F.2d at 621).  Taking Kumar's well-pleaded allegations as true, at this juncture, *Truman*, 26 F.3d at 594, the Court finds that Kumar is an aggrieved person who has established constitutional standing to enforce the Voting Rights Act.

Kumar alleges that he has been stripped of the right to elect representatives of his choice due to an at-large electoral system which dilutes the population of minority populations. Specifically, Kumar avers that he is a member of a minority group—Indian (Asian)—he is a registered voter in FISD, and Defendants have impermissibly diluted his minority groups voting power in his district.  Surely, such allegations constitute the Article III injury that courts must find to allow an action to proceed under the Voting Rights Act.  The right to a democratic process free of invidious discrimination is the cornerstone of the Voting Rights Act—and having that freedom denied or impaired due to an unjust system is the quintessential harm Congress sought to prevent. As such, the Court finds that Kumar has established, for 12(b) standing purposes, that he has suffered an injury in fact.  *See Spokeo*, 136 S. Ct. at 1547 (citing *Lujan*, 504 U.S. at 560–61).

Kumar has also demonstrated that his injury is fairly traceable to the challenged conduct of Defendants. Kumar claims that Defendants' at-large electoral process, which requires a district-wide plurality for staggered positions, has resulted in a system that is "disconnected from the diverse multiethnic, multiracial, and multilingual community," due to Defendants dilution of minority votes. This dilution, Kumar continues, has resulted in Defendants' failure to prevent discriminatory actions. Such discriminatory conduct and cultural insensitivity, Kumar contends, are not coincidental; rather, they are the tangible side-effects of a diseased political process that chills the voter turnout of minorities. Put simply, Kumar claims that if Defendants had heeded his advice and implemented single-member voting districts throughout FISD, the continuous disenfranchisement of minorities, including Kumar, would cease. In other words, Kumar's inability to elect representatives of his choice free from racial discrimination, and the inevitable fallout that has allegedly occurred due to such dilution, is attributable to the at large electoral system Defendants constructed. Kumar has accordingly established the requisite traceability element of constitutional standing. *See Spokeo*, 136 S. Ct. at 1547 (citing *Lujan*, 504 U.S. at 560–61).

Finally, Kumar has demonstrated that if the Court were to grant Kumar the declaratory and injunctive relief he seeks, Kumar's injury would be redressed. Kumar asks that the Court, among other things, declare Defendants' at-large electoral process unconstitutional; grant a permanent injunction against Defendants prohibiting them from conducting further elections under said system; and institute an order directing Defendants to devise an election plan that complies with Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments that applies to all future elections. Should the Court grant Kumar's requests, it is readily apparent that the stain

of Defendants' flawed electoral system[2] would be lifted and the harm Kumar complains of redressed. *See Spokeo*, 136 S. Ct. at 1547 (citing *Lujan*, 504 U.S. at 560–61).

Consequently, the Court finds that Kumar has established constitutional standing to proceed on his Voting Rights Act claims. It remains to be determined, however, whether Kumar has established prudential standing.

## II.     Prudential Standing

While it is axiomatic that a plaintiff must have constitutional standing to proceed on his or her claims, a plaintiff is also required, at least for the time being, to establish prudential standing. *See St. Paul Fire & Marine Ins. Co. v. Labuzan*, 579 F.3d 533, 539 (5th Cir. 2009) ("Prudential standing requirements exist in addition to the immutable requirements of Article III as an integral part of judicial self-government.") (internal quotation marks omitted). In one of the Supreme Court's seminal cases on standing, *Lexmark*, Justice Scalia, writing for a unanimous Court, explained that while the Article III "Cases" and "Controversies" analysis established the absolute minimum for constitutional standing, "[i]n recent decades, [the Supreme Court has] adverted to a 'prudential' branch of standing." 572 U.S. at 125. The Supreme Court noted that while prudential standing has not been "exhaustively defined," three principles characterized this judicial construction; namely, "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Id.* at 126 (citing *Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1, 12 (2004) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). Although the Court enumerated three principles that encompassed "prudential standing," the Court held that

---

[2] Again, the Court notes that it is taking Kumar's well-pleaded allegations as true for this stage of litigation and not holding that Kumar's allegations are in any way factually correct. *See Truman*, 26 F.3d at 594.

the third principle—that a plaintiff's complaint must fall within the zone of interests protected by the law invoked—is a matter of statutory construction, rather than prudential standing. *Id.* The Court also noted that the first principle—the bar on generalized grievances—is a constitutional strand of standing, not a prudential strand. *Id.* at 127 n.3 (citing *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (per curiam); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 344–346 (2006); *Lujan*, 504 U.S. at 573–574.

After *Lexmark*, "the doctrine of third-party standing or *jus tertii*, still remains [for the time being] in the prudential category." 33 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 8343, at 1 (2d ed. April 2019 Update). To be sure, while the viability of third-party standing jurisprudence remains uncertain, the Fifth Circuit has held that the "prudential requirement that a party must assert its own rights [still applies], *see, e.g., Danos v. Jones*, 652 F.3d 577, 582 (5th Cir. 2011), and we are bound to follow our precedent until the Supreme Court squarely holds to the contrary, *see Exelon Wind 1, L.L.C. v. Nelson*, 766 F.3d 380, 394 (5th Cir. 2014)." *Superior MRI Servs., Inc. v. All. Healthcare Servs., Inc.*, 778 F.3d 502, 504 (5th Cir. 2015). The requirements of third-party standing, then, are that a litigant, ordinarily, "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Triplett*, 494 U.S. at 721 (citing *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)); *see also* 33 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 8343, at 1 (2d ed. April 2019 Update). ("The problem of third-party standing arises where a plaintiff seeks to enforce the legal rights of some third party not before the court."). The reasoning behind the third-party standing doctrine is

plentiful, but two reasons promulgated by the Supreme Court, in *Singleton v. Wulff*, are sufficient

for the present inquiry. 428 U.S. 106, 113–14 (1976). As articulated by the Supreme Court,

> The reasons are two. First, the courts should not adjudicate such rights unnecessarily, and it may be that in fact the holders of those rights either do not wish to assert them, or will be able to enjoy them regardless of whether the in-court litigant is successful or not. Second, third parties themselves usually will be the best proponents of their own rights.

*Id.* at 113–14.

The third-party standing rule, however, is not absolute. *See Kowalski v. Tesmer*, 543 U.S.

125, 129–130 (2004). Indeed, the Supreme Court has held that "a party that satisfies the

requirements of Article III standing may seek to enforce the legal rights of a third party where: (1)

the party has a 'close' relationship with the possessor of the right; and (2) 'there is a 'hindrance'

to the possessor's ability to protect its own interests.'" *Id.* at 130; *see also Veasey*, 29 F. Supp. 3d

at 908–09 (applying the *Kowalski* two-step framework to determine whether plaintiffs had third-

party standing to assert a Voting Rights Act violation); *Greater Birmingham Ministries v. State*,

161 F. Supp. 3d 1104, 1115 (N.D. Al. 2016) (same). Notably, the Supreme Court has been "quite

forgiving" in the context of the First Amendment and when "enforcement of the challenged

restriction *against the litigant* would result indirectly in the violation of third parties' rights." *Id.*

Otherwise, the Court has "not looked favorably upon third-party standing." *Id.* (citations omitted).

Here, the parties dispute whether Kumar has satisfied the prudential doctrine of third-party

standing. At the outset, the Court notes some tension between Kumar's First Amended Complaint

(Dkt. #23) and Kumar's Response (Dkt. #48). Kumar, in his Response, maintains that he "never

states he is suing 'on behalf of' anyone other than *himself*." (Dkt. #48) (emphasis added).

Therefore, Kumar contends that Defendants are mistaken in construing Kumar's pleadings as

violating the third-party standing doctrine. Yet, in the same briefing, Kumar states that he is

entitled to represent the interests of the Indian (Asian) community, to which he belongs, as the sole

plaintiff. To be sure, Kumar explicitly calls attention to Defendants' concession that "Defendants do not contend that Plaintiff does not have standing to represent the interests of the minority group he belongs to—Indian (Asian) voters who reside in FISD." (Dkt. #48). Further, Kumar argues that "Defendants' Motion is premised on the erroneous assertion that Mr. Kumar only has standing to represent other Asian voters." (Dkt. #48). Kumar's arguments are contradictory. Kumar asserts that he is only trying to represent *himself*, and in the same brief argues that he has *standing* to represent all Asians—and, indeed, all African Americans and Hispanics—who reside in FISD. These two statements cannot logically coincide.

Kumar's First Amended Complaint goes further. In his First Amended Complaint, Kumar seemingly seeks declaratory and injunctive relief on behalf of all African Americans, Hispanics, Asians, and other minorities. Although Kumar now does an about face on such request, his First Amended Complaint, especially in light of his Response to the present Motion, is anything but clear. A review of various portions of Kumar's Amended Complaint does well. First, Kumar seems to premise his lawsuit upon solely himself when he states, in relevant part:

> 4. Mr. Kumar brings this Complaint because the at-large election system employed by FISD denies equal voting opportunity to voters of color, many of whom are parents of children enrolled in FISD schools, thereby denying them the opportunity to elect candidates of their choosing to represent their communities. *Accordingly, Mr. Kumar seeks judicial relief for violations of Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301 (the "Voting Rights Act") and the Fourteenth and Fifteenth Amendments of the United States Constitution*.

> 5. Specifically, Mr. Kumar requests that the Court issue an injunction prohibiting FISD, its Trustees, agents, and all persons acting in concert with them, from administering, implementing, or conducting any future elections for the Board under an at-large electoral system, and a declaratory judgment declaring that the current at-large system in FISD violates federal law. *This relief will ensure that Mr. Kumar's voice—and the voices of the community—are properly factored into the decisions affecting FISD students and the School District to which they belong*.

(Dkt. #23) (emphasis added). Moreover, Kumar provides as follows under the subheading "Plaintiff":

10. Mr. Kumar is a United States citizen and registered voter who resides within the boundaries of FISD. Mr. Kumar is an active member of his community and a respected Certified Public Accountant. Mr. Kumar currently serves as the Precinct Chair for the Collin County Republican Party.

11. Mr. Kumar moved from India to the United States in 1994. He has been a United States citizen since 2006. Attracted to FISD because of its growing economy and the diversity of its population, he and his family bought a home in the City of Frisco, within FISD, in 2014. He has two daughters who attend FISD schools, and he has a deep personal interest in the academic success of the school district.

(Dkt. #23). Yet after Kumar asserted that he was the sole plaintiff and that he was suing on his own behalf, he then muddled the complaint by seemingly attempting to represent all African Americans, Hispanics, Asians, and other minorities who reside in FISD. Should Kumar object to such categorization, a review of Count 1 of the Complaint, "Declaratory Relief for Violation of Section 2 of the Voting Rights Act," is telling. In Count 1, Kumar states as follows:

55. The allegations set forth in paragraphs 1–52 above are hereby incorporated as if fully set forth herein.

56. Section 2 of the Voting Rights Act prohibits any standard, practice or procedure that results in the denial or abridgment of minority voting rights. *Specifically, it forbids any electoral system that denies African Americans, Hispanics, Asians, and other minority groups an opportunity equal to that afforded to other members of the electorate to elect representatives of their choice.*

57. *FISD's at-large electoral system for electing its Board unconstitutionally dilutes the voting strength of African Americans, Hispanics, Asians, and other minority voting populations and is not equally open to participation by FISD's voters of color.* Further, the electoral system results in African Americans, Hispanics, Asians, and other minority populations having less opportunity than other FISD voters to meaningfully participate in the electoral process and to elect representatives of their choice.

58. The African American, Hispanic, Asian, and other communities of color in FISD are sufficiently large, geographically compact, and constitute a politically unified group that votes cohesively as a bloc, such that a properly-apportioned single-member electoral district can be drawn in which minorities would constitute a majority of eligible voters.

59. FISD Board elections are characterized by racially-polarized voting in which the predominately White voting bloc votes in a way that regularly defeats the candidates of choice of African American, Hispanic, Asian, and communities of color and has a chilling and discouraging impact on participation from voters of color. *Thus, based on the totality of past and present circumstances, the FISD electoral system impermissibly dilutes the minority vote and stymies that community's ability to participate fully in the election process.*

60. Accordingly, Mr. Kumar requests that the Court issue a declaratory judgment that the FISD electoral system violates Section 2 of the Voting Rights Act.

(Dkt. #23) (emphasis added). It is not readily apparent, from a plain reading of Kumar's First Amended Complaint, whom Kumar is attempting to represent—i.e., whether Kumar is just representing himself or attempting to represent entire minority communities in FISD. Thus, the Court must determine whether Kumar is: (1) simply trying to put on evidence of a minority coalition under *Thornburg v. Gingles*, 478 U.S. 30, 50–52 (1986) to demonstrate how his *personal* legal interests have been injured; or (2) attempting to represent the collective interests of all African Americans, Hispanics, Asians, and other minorities who live in FISD.

This brings the Court to the present matter. Defendants concede, and Kumar concurs, without citation to a single authority, that Kumar is permitted to *represent* all Indian (Asian) voters who reside in FISD without the use of a class action. Such representation is permissible, according to the parties, because they view Kumar's representation of Asians, a minority group to which he belongs, as a separate issue from his representation of other minority groups to which he does not belong. Moreover, Kumar avers that a class action is not textually required by the Voting Rights Act; therefore, his representation of various minority groups, as a sole plaintiff, should be permitted. While Defendants conceded a portion of Kumar's representation, the Court is wary of the possibility that Kumar is wading into the waters of third-party standing. Therefore, the Court must substantiate, independently, whether such representation is permissible. Having considered the text of the Voting Rights Act, the inherent purpose of the Act, and precedent interpreting such Act, the Court agrees with Kumar that the Voting Rights Act does not necessitate a class action for Kumar to institute the present action.

The Court is additionally presented with the following issue: Whether Kumar may individually represent African Americans, Asians, Hispanics, and other minority groups who

reside in FISD in his Voting Rights Act action rather than simply represent himself and utilize a minority coalition to prove *he* has been injured. The Court finds that basic prudential standing jurisprudence prohibits Kumar from representing the legal rights and interests of third parties not before the Court. Moreover, the Court finds that Kumar has not met the *Kowalski* exception to the third-party standing doctrine. For the foregoing reasons, the Court finds that while Kumar has established standing to represent himself, whom he intends to represent is anything but clear and he must accordingly amend his complaint.[3]

   a.   The Voting Rights Act of 1965 Does Not Necessitate a Class Action to Enforce the Statute

The Voting Rights Act of 1965 provides as follows:

**(a)** No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

**(b)** A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C. § 10301. Additionally, 52 U.S.C. § 10302, formerly 42 U.S.C. § 1973(a), provides, in relevant part, that the Attorney General or "an aggrieved person" may institute a "proceeding under any statute to enforce the voting guarantees of the Fourteenth or Fifteenth Amendment . . . ." As discussed earlier, and as evidenced by 52 U.S.C. § 10301, Congress amended the Voting Rights Act of 1965 to provide private "aggrieved person(s)" standing to institute actions under the Voting

---

[3] Because Defendants challenge Kumar's standing at the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice . . . ." *Lujan*, 504 U.S. at 561.

Rights Act. *See Veasey*, 29 F. Supp. 3d at 908–09 (citing *Roberts*, 883 F.2d at 621). Again, "[a]ggrieved persons" have been defined as those voters "whose rights have allegedly been denied or impaired." *Id.* (citing *Roberts*, 883 F.2d at 621). The text of the Voting Rights Act is clear. Any aggrieved "person" may institute an action to uphold the guarantees of the Fourteenth or Fifteenth Amendments and the statutes that so correspond. The use of the singular term, "person," denotes that a collective group of similarly situated individuals, or "persons," is not statutorily required to maintain an action under the Voting Rights Act. *See Person*, Webster's Third New International Dictionary (1976) (defining person as "an individual human being"); *see also Person*, The Random House College Dictionary (1973) (defining person as "a human being"). Thus, a class action is not mandated by the text.

Moreover, caselaw in this Circuit does not necessitate a class action to proceed under the Voting Rights Act. While this Circuit has a variety of cases where a minority coalition asserts some form of voting rights infringement, *see e.g.*, *Brewer v. Ham*, 876 F.2d 448 (5th Cir. 1989); *Campos v. Baytown*, 840 F.2d 1240, 1242 (5th Cir. 1988); *LULAC, Council No. 4386 v. Midland Indep. Sch. Dist.*, 812 F.2d 1494, 1495 (5th Cir. 1987), the Court is unaware of any authority, and the parties cannot produce any authority, which prohibits individual representation in a Voting Rights Act case. What is more, the Court has discovered—again, independently due to the parties not adequately briefing this issue—that individual plaintiffs have previously brought Voting Rights Act actions absent class actions.

In *Benavidez v. City of Irving, Tex.*, 638 F. Supp. 2d 709, 710 (N.D. Tex. 2009), for instance,[4] Manuel A. Benavidez brought an action against the City of Irving, its mayor, and its city council members alleging voter dilution pursuant to the Voting Rights Act of 1965. As an

---

[4] An individual plaintiff, albeit, the same plaintiff, Benavidez, has also instituted actions, absent a class or collective action, in *Benavidez v. Irving Indep. Sch. Dist.*, 2014 WL 4055366, at *1 (N.D. Tex. Aug. 15, 2014).

individual plaintiff and a Hispanic citizen, Benavidez alleged that Irving's at-large electoral system impermissibly diluted the voting power of all of Irving's Hispanic voters. *Id.* at 711. Prior to trial, the Court held that Benavidez, as an individual plaintiff, had standing when it stated:

> Having established the three *Gingles* factors, Plaintiff has standing to bring this action: he is a minority voter who resides within a proposed district in which the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district, and voting is racially polarized. Thus, he has been affected "in a personal and individual way," he has demonstrated "a causal connection between the injury and the conduct complained of," and it is likely "that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (setting forth the required elements for standing); *see also Salas v. Sw. Texas Junior Coll. Dist.*, 964 F.2d 1542, 1554 (5th Cir. 1992) (stating that the *Gingles* analysis "is an inquiry into causation— whether the given electoral practice is responsible for plaintiffs' inability to elect their preferred representatives").

*Id.* at 731 n.14. The Court then denied defendants' motion for summary judgment and held a four-day bench trial on Benavidez' claim. *Id.* In the end, the Court found that Irving's electoral scheme violated the Voting Rights Act. *Id.* at 732. For present purposes, it is notable that the Court in *Benavidez* found an individual plaintiff had standing to assert a Voting Rights Act when the plaintiff would necessarily have to meet his evidentiary burden by putting on evidence of how the electoral system affected an entire minority population. Even more notable is the fact that the Court was not concerned with the third-party standing doctrine, or at least such concern was absent from the record. Rather than wading into the waters of third-party standing, the Court viewed Benavidez' standing from the constitutional lens, then considered his membership in a particular minority group as merely a portion of his evidentiary burden under *Gingles* such that Benavidez was not required to bring a class action to put on evidence of discrimination which affected him.[5]

---

[5] The *Benavidez* Court—issuing its opinion pre-*Lexmark* which may account for some of its reasoning—seemingly conflated the *Gingles* evidentiary burden with standing. While the *Gingles* factors may go to causation and thus touch tangentially on the injury and traceability prongs of constitutional standing, the Court is unaware of a requirement that a plaintiff establish the *Gingles* factors to demonstrate constitutional standing. Any such requirement would put the cart before the horse.

Thus, while it may be more of a common practice for Voting Rights Act actions to proceed with multiple plaintiffs, it is not unprecedented for a plaintiff to institute an action individually. Furthermore, any requirement that multiple plaintiffs of the same minority group must coalesce in an action as a class to proceed would be an antithetical requirement that would disserve the overarching purpose of the Act—stomping out invidious racial discrimination. Finally, a review of the *Gingles* factors supports this conclusion. Under *Gingles*:

- First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district.

- Second, the minority group must be able to show that it is politically cohesive. If the minority group is not politically cohesive, it cannot be said that the selection of a multimember electoral structure thwarts distinctive minority group interests.

- Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate.

*Gingles*, 478 U.S. at 50–51. A review of the threshold *Gingles* factors reveals that a plaintiff must necessarily put on evidence of discrimination against the minority group to which they belong to demonstrate discrimination against themselves. This evidentiary burden remains whether a plaintiff is joined by a coalition of similarly situated plaintiffs or is individually representing him- or herself. With these considerations in mind, the Court finds that Kumar is correct in his assertion that he may institute an action under the Voting Rights Act as an individual Plaintiff. This conclusion, however, is not the end of the matter.

### b. Coalition Pleading & Standing Jurisprudence

With the recognition that a class action is not necessary, under the text, precedent, and policy surrounding the Voting Rights Act, a question remains: How does standing jurisprudence limit an aggrieved person's ability to assert the legal rights and interests of minority groups who have not joined the action. The answer is clear. While the Voting Rights Act may permit an

individual plaintiff to proceed with his or her claims under the statute, and therefore put on *Gingles* evidence related to his or her claim,[6] standing jurisprudence limits third party representation. To be sure, in the Fifth Circuit, the third-party doctrine is, at this time, alive and well. *See Superior MRI Servs.*, 778 F.3d at 504 (citing *Danos*, 652 F.3d at 582). Consequently, Kumar "'must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" *Triplett*, 494 U.S. at 721 (citing *Valley Forge Christian College*, 454 U.S. at 474 (quoting *Warth*, 422 U.S. at 499)). For Kumar to be permitted to represent the interests of a third party, he must demonstrate, under *Kowalski*, that he (1) "has a 'close' relationship with the possessor of the right; and (2) 'there is a 'hindrance' to the possessor's ability to protect its own interests.'" *Kowalski*, 543 U.S. at 129–130.

The Court is presented with an issue regarding the interplay of coalition pleading and the third-party standing doctrine. Defendants argue that by asserting that he is representing a minority of coalition of African American, Asian, Hispanic, and other minority voters, Kumar has necessarily asserted the legal rights or interests of third parties without those parties' participation. Kumar claims he is not attempting to represent anyone other than himself; yet, in the same brief, Kumar contradicts himself and says he has *standing* to represent entire minority groups. As *Benavidez* made clear, an individual plaintiff may put on *evidence* of how the minority group to which he belongs has been affected by an electoral system to meet the *Gingles* burden while still maintaining standing. This action, however, is different than *Benavidez*. Here, Kumar dances between arguing that: (1) he has standing to represent an entire minority community—multiple for

---

[6] Kumar is correct that the Fifth Circuit permits plaintiffs in Voting Rights Act cases to allege minority coalitions of more than one minority group to attempt *Gingles* threshold factors. *See Campos v. City of Baytown*, 840 F.2d 1240 (5th Cir. 1988), *reh'g denied*, 849 F.2d 943 (1988) (per curiam), *cert denied*, 492 U.S. 905 (1989). The Court sees no caselaw, and the parties present none, that prohibits Kumar from, for evidentiary purposes only, asserting that he is part of a minority coalition that spans across various minority groups for purposes of showing how he is personally harmed. That is an evidentiary issue—when absent from a party asserting standing on each group's behalf—that may be taken up at trial. And, again, that is a separate matter from standing which is the basis of the Court's opinion today.

that matter—or (2) that he is simply representing his own personal interests. By conflating standing and evidentiary burdens, Kumar has taken this case out of the situation presented in *Benavidez*.

The Court can no longer ascertain whom Kumar is attempting to represent given his contradictory assertions. If Kumar is genuinely attempting to represent simply himself, his complaint does not read that way and his inconsistent Response only further ruptures the seams of any supporting argument. And if Kumar is attempting to represent an entire minority community—or communities for that matter—he certainly has not met the *Kowalski* standard to permit third party representation. To make it abundantly clear, given both parties conflation of evidentiary burdens under *Gingles* and standing jurisprudence, a plaintiff representing a third party's legal rights and interests is entirely different than putting on evidence of how his or her own minority group has suffered from voter dilution, as *Benavidez* did, to demonstrate how he or she has been *personally* affected and injured. In one instance, the instance where, as Kumar does at times here, the plaintiff actually alleges that he or she is representing an entire community, third-party standing is implicated. The plaintiff, in that scenario, is not simply trying to represent his or her own interests anymore; rather, he or she is representing a de facto class action of one. In the other instance, the case of *Benavidez*, the plaintiff is asserting his or her *own* legal interests and demonstrating how those *personal* interests have been harmed by using statistical evidence of a particular minority group to establish that the *Gingles* factors have been met.

While the Court is not clear, at this moment, whom Kumar is intending to represent, one thing is clear: Kumar does not have standing to *represent* entire minority groups. To be sure, Kumar has not provided a scintilla of evidence, or any semblance of an argument, that he has a

close relationship with any of the communities he attempts to represent. *Id.* at 129–30.[7] Furthermore, Kumar has not provided any evidence that any one of these communities where somehow hindered from joining his action. *Id.* Rather, Kumar spends the entirety of his brief poking holes in Defendants arguments while filling in none of the holes that he, himself, creates. To allow Kumar to represent entire minority groups without their input would permit Kumar to assert rights of absent members who may not wish to assert such rights. *See Singleton*, 428 U.S. at 113–14. Again, Kumar asserting his own rights, then utilizing overarching statistical evidence is one matter, representing a large swath of an electorate is another. Further, the Court would be hard-pressed to adjudicate a case where legal rights and interests of third parties are in question and those parties are not present to discuss the intricacies of how, if to any extent, the electoral process has impeded their voting rights. This would be especially true if the Court was pressed to determine whether a minority coalition exists and Kumar was then permitted to speak on behalf of all minority groups absent even some tacit form of consent. Therefore, the Court finds that Kumar does not have standing to represent the entire community of African Americans, Asians, Hispanics, or other minority groups that he, at times, seemingly claims he has standing to represent.

With that being said, standing is not, and must not be, a guessing game. *See Labuzan*, 579 F.3d at 539. Kumar has presented the Court with two different arguments, or theories, which are impermissibly jumbled and contradictory, and seemingly is hoping that if the Court rejects one argument, at least he has the other. Because the Court finds that Kumar may only represent himself, the Court must reject Kumar's attempts to assert standing on behalf of entire minority communities. Thus, the one argument is rejected. *See Kowalski*, 543 U.S. at 129–130. The question, then, is what to do with Kumar's other argument. In the interest of justice, rather than

---

[7] The Court would not be considering the *Kowalsky* exception to third-party standing had Kumar not established constitutional standing. *See Kowalski*, 543 U.S. at 129–130.

dismissing Kumar's suit without prejudice because of his contradictory line of argument which calls into question the prudential line of standing, the Court finds it prudent to permit Kumar to amend his complaint.[8] This amended complaint is only permitted because: (1) the Court has found that Kumar has constitutional standing as to himself; (2) Kumar's pleadings are entirely unclear on whether Kumar is attempting to represent parties outside of himself; (3) the Court must have full knowledge of Kumar's purported representation to consider any prudential standing concerns; and (4) while the Court has stated that, at this time, Kumar's third-party standing argument is foreclosed, Kumar still has a viable argument that he is merely attempting to represent himself. *See Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 474 n.4 (5th Cir. 2013) ("[P]rudential standing, while not jurisdictional, nonetheless affects justiciability.") (citation omitted); *Lewis v. Knutson*, 699 F.2d 230, 236 (5th Cir. 1983) ("[T]he constitutional limitation requiring an injury to satisfy the case or controversy requisite goes to the court's jurisdictional *power* to hear the case, while the prudential limitation goes to the court's administrative *discretion* to hear the case.") (emphasis in original); *see also Kerr v. Polis*, 930 F.3d 1190, 1994 (10th Cir. 2019) ("Although the jurisprudence surrounding standing and jurisdiction has at times been muddled, we have clearly held that prudential standing is not a jurisdictional limitation . . . .") (citing *Niemi v. Lasshofer*, 770 F.3d 1331, 1345 (10th Cir. 2014) (citing *Wilderness Soc. v. Kane Cnty.*, 632 F.3d 1162, 1168 n.1 (10th Cir. 2011) (en banc)); *Rawoof v. Texor Petroleum Co., Inc.*, 521 F.3d 750, 756 (7th Cir. 2008) ("Prudential-standing doctrine 'is not jurisdictional in the sense that Article III standing is.'") (citing *MainStreet Org. of Realtors v. Calumet City, Ill.*, 505 F.3d 742, 745 (7th Cir. 2007)).

---

[8] The Court is not foreclosing Kumar's option of instituting a class action in his amended complaint as a means of *representing* the minority groups he seems to be attempting to represent. The Court is only holding that, as the matter currently stands, Kumar may not represent entire minority groups as a single plaintiff.

Therefore, in the interest of justice, Kumar has fourteen (14) days to amend his complaint. In this amended complaint, Kumar must be unequivocally clear. If Kumar wishes to *represent*— i.e., assert that he has standing to represent parties other than himself—the African American, Asian, and Hispanic communities who reside in FISD, he is now aware of what the Court will require for such representation to occur. If, as his other argument goes, he is merely representing himself and not entire minority groups, then his amended complaint must, without question, make that representation explicit. This Motion will be subject to reinstatement should Kumar fail to amend his complaint and will result in dismissal without prejudice should Kumar fail to carry his burden.

## CONCLUSION

It is therefore **ORDERED** that Defendants' Motion to Dismiss for Lack of Standing Pursuant to Fed. R. Civ. P. 12(b)(1) (Dkt. #41) is hereby **DENIED**, subject to reinstatement, pending Kumar's filing of his Amended Complaint.

It is further **ORDERED** that Kumar has fourteen (14) days from the date the Court's Memorandum Opinion and Order is published to amend his complaint.

**SIGNED this 6th day of March, 2020.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE