UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| SURESH KUMAR | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | Civil Action No. 4:19-cv-00284 |
| | § | |
| FRISCO INDEPENDENT SCHOOL | § | |
| DISTRICT, ET AL. | § | |
| | § | |
| Defendants. | § | |

## DEFENDANTS' POST-TRIAL CLOSING BRIEF

Defendants Frisco Independent School District and its Board of Trustees file the following post-trial closing brief.

**1.    The Gingles Factors**

"Under *Gingles*[1], plaintiffs challenging an at-large system on behalf of a protected class of citizens must demonstrate that (1) the group is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) it is politically cohesive; and (3) the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate." *LULAC v. Clements,* 999 F.2d 831, 849 (5th Cir. 1993) (en banc).

**2.    Plaintiff Failed to Establish the First *Gingles* Factor – Compactness**

"Satisfying the first *Gingles* precondition – compactness – normally requires submitting as evidence hypothetical redistricting schemes in the form of illustrative plans." *Gonzalez v. Harris Cnty.*, 601 Fed. Appx. 255, 258 (5th Cir. 2015). "The proposed plan must [ ] encompass a district with a greater-than-50-percent-voting-age minority population." *Id.* at 258. "As the Supreme Court

---

[1] *Thornburg v. Gingles,* 478 U.S. 30 (1986).

has made clear, the 50% threshold is a bright line test." *Benevidez v. Irving Indep. Sch. Dist.,* 690 F.Supp.2d 451, 457 (N.D. Tex. 2010).

### A. Plaintiff's illustrative district must respect traditional districting principles.

According to the Fifth Circuit, "under *Gingles, compactness requires accounting for traditional districting principles* such as maintaining communities of interest and traditional boundaries." *Gonzalez*, 601 Fed. Appx. at 258 (emphasis added). Importantly, "*those principles must be considered when analyzing that aspect of the first Gingles precondition*." *Id.* at 259. See also *Fairley v. Hattiesburg,* 584 F.3d 660, 670 (5th Cir. 2009) ("Courts are expected, in evaluating redistricting plans, to take into account 'traditional districting principles such as maintaining communities of interest and traditional boundaries.'").

"[W]hile [ ] a compactness determination should not hinge on the shape of a district, the shape of a district certainly cannot be disregarded in a compactness inquiry. …[I]t is clear that shape is a significant factor that courts can and must consider in a *Gingles* compactness inquiry." *Sensley v. Albritton,* 385 F.3d 591, 596 (5th Cir. 2004). And, in addition to shape, plaintiffs cannot "ignore traditional districting principles such as maintaining communities of interest and traditional boundaries." *Id*. at 598. "Thus, to evaluate compactness, the Court considers the dispersion of the relevant minority population, the shape of the proposed district (as measured by a visual evaluation and by statistical measures of compactness) and the causes underlying its shape, and the district's compliance with traditional redistricting principles (such as respect for communities of interest and traditional boundaries)." *Perez v. Abbott,* 274 F.Supp.3d 624, 639 (W.D. Tex. 2017); see also, *Perez v. Abbott*, 253 F.Supp.3d 864, 911 (W.D. Tex. 2017) (same).

**B. Race cannot predominate over traditional districting principles, and bizarrely shaped districts based on race are not compact.**

As observed by the three judge panel in *Perez v. Abbott,*

> Justice O'Connor's plurality opinion in *Bush v. Vera* [517 U.S. 952, 980 (1996)] makes clear that 'district shape is not irrelevant.' … Justice O'Connor agreed with the district court's finding that the district had 'no integrity in terms of traditional, neutral redistricting criteria'….Although she used these facts to determine that race predominated over traditional districting principles in drawing [the proposed district], Justice O'Connor also relied on them to determine that the district was non-compact…. Plaintiffs offer no explanation of why certain bizarrely shaped appendages are included, while nearby areas that could presumably form communities of interest are carefully excised. There is no evidence that specific lines [ ] respect specific communities of interest such as neighborhoods…. Thus, because of a lack of such evidence, the shape of the proposed district, and the other factors discussed above, the inescapable inference remains that the Hispanic citizen voting age population is not sufficiently compact and it is necessary to draw bizarre and convoluted lines to obtain enough population to reach the majority threshold…. ***Precedent thus indicates that if a proposed district is simply too bizarrely shaped because the minority population is dispersed in such a way that traditional districting criteria are barely considered, if at all, in drawing the district, it will be found to be non-compact for § 2 purposes.***

*Perez*, 253 F.Supp.3d at 913-17 (emphasis added).

Traditional principles of "drawing districts and well-established demographic considerations" include the following: "First, districts should generally have equal total population. For municipalities, the population size of each district should not deviate from the others by more than 10%. Second, districts must comply with legal requirements, such as the Equal Protection Clause. And third, districts must be drawn consistent with existing official political boundaries (along city or county lines) and informed geographic boundaries, such as neighborhoods or communities that share a common interest." *Benavides v. City of Irving,* 638 F.Supp.2d 709, 714 (N.D. Tex. 2009); see also *Perez*, 253 F.Supp.3d at 911 (traditional districting

principles include "contiguousness, population equality, maintaining communities of interest, respecting traditional boundaries, and providing protection to incumbents").

A district's compactness must be a relative measure based on location and population density and "[i]n a major urban county [like Collin and Denton Counties], compactness makes little sense if considered in terms of geographic sprawl alone, but it seems far more probative when viewed in terms of a city's or county's neighborhoods, geopolitical subdivisions, and business location." *Vera v. Richards*, 861 F.Supp. 1304, 1341 (S.D. Tex. 1994), aff'd sub nom, *Bush v. Vera*, 517 U.S. 952 (1996).

To summarize, as stated by the district court in *Jindal*, "in assessing whether a district complies with traditional districting principles, a court should also determine whether the hypothetical district respects 'communities defined by actual shared interests.' If race is the only 'common thread' that binds certain areas together, the district cannot be said to respect communities of interest." *Terrebonne Parish Branch NAACP v. Jindal*, 274 F.Supp.3d 395, 424 (M.D. La. 2017) (quoting *Miller v. Johnson*, 515 U.S. 900, 916, 920 (1995)).

## C. The evidence at trial shows Plaintiff failed to satisfy the compactness inquiry

Here, the evidence at trial showed both (1) Ely's illustrative district does not meet the 50% bright line test for compactness, and (2) Ely's illustrative district fails to consider traditional districting principles and therefore fails the compactness inquiry.

### (1) Ely's illustrative district does not meet the 50% bright line test for compactness

Plaintiff's expert demographer, David Ely, only drew one proposed illustrative district to attempt to satisfy the first *Gingles* factor -- compactness. To create his illustrative district, Ely combined Asians, Blacks, and Hispanics as a coalition minority group because he could not reach the required *Gingles* 50% majority-minority bright line threshold without combining all three

groups. Ely drew only one illustrative district because it was clear that it would be impossible to draw another one, a fact confirmed by maps prepared by FISD's diversity task force showing wide-spread minority dispersion in FISD. Tellingly, the combined Asian, Black, and Hispanic citizen voting age population in Ely's sole illustrative district is **only 50.03% -- just 0.03%** above the required 50% bright line threshold. Tr2: 91-92, 103, 135-36; Tr3: 121-24; Tr4: 98-99; Plaintiff's Exhibit 94; Defendants' Exhibit 19.[2] Moreover, since Ely's illustrative district is the only potential majority-minority district that can meet the 50% bright line threshold, it is therefore mathematically impossible to draw six other contiguous districts of approximately equal population (for a total of seven districts) as required by Texas law, Tex. Educ. Code § 11.052. Tr3: 126-27.  See, e.g., *Benavides*, 638 F.Supp.2d at 714 (illustrative districts must, *inter alia*, "comply with legal requirements").

Ely's 50.03% majority-minority district is within the margin of error and "very possibly" could actually be below the required 50% bright line threshold. Tr3: 125-26. Critically, this means that if just one of the three minority groups (Asians, Blacks, and Hispanics) is not cohesive with the others under the standard articulated by Judge Jones' concurrence in the en banc *LULAC v. Clements* opinion discussed *infra*, then that group should not be included for purposes of calculating the minority population for the *Gingles* compactness factor.[3] Here, the evidence at trial shows that Asians in FISD are not cohesive with either Blacks or Hispanics with respect to income,

---

[2] "Tr2: 91-92, 103, 135-36" means trial transcript day two (of four), pages 91-92, 103, 135-36. "Tr3: 123-24" means trial transcript day three, pages 123-24. "Tr4: 98-99" means trial transcript day four, pages 98-99.

[3] According to the Fifth Circuit, "this court has required vote dilution claimants to prove that **their** minority group exceeds 50% of the relevant population in the demonstration district. In *Gingles,* the Supreme Court required plaintiffs to demonstrate 'a majority.'" *Valdespino v. Alamo Heights Indep. Sch. Dist.,* 168 F.3d 848, 852-53 (5th Cir. 1999) (emphasis added). Here, the minority group that is claiming vote dilution – in the words of the Fifth Circuit, "**their**" minority group – is not simply Asians or Blacks or Hispanics residing in FISD.  Rather, in this lawsuit, "**their**" group of claimants is an aggregation of Asian, Blacks, and Hispanics in FISD. Thus, it is axiomatic that each of these three groups must be cohesive with the other – i.e., consider themselves "one" with the other – so to be included in the illustrative district for purpose of the 50% bright line threshold.

poverty, health, and/or education. See discussion *infra* regarding the socioeconomic results in Table 30 of Mayer's report, Plaintiff's Exhibit 6.[4] Thus, removing Asians from the aggregated minority population, Ely's proposed illustrative district – the only one offered by Plaintiff – cannot meet the required 50% bright line threshold and therefore fails the *Gingles* compactness factor for this reason.

### (2) Ely's illustrative district fails to consider traditional districting principles

In addition to the above, the Court should find that Plaintiff failed to satisfy the *Gingles* compactness inquiry because Ely intentionally failed to consider traditional districting principles such as maintaining communities of interest in creating his illustrative district. Again, as mandated by the Fifth Circuit, "*those principles must be considered when analyzing that aspect [compactness] of the first Gingles precondition.*" *Gonzalez,* 601 Fed. Appx. at 258-59.

Here, **Ely admitted that he "did not do a community of interest analysis"** when creating his proposed district because, in his opinion, he did not need to do one notwithstanding Fifth Circuit precedent (such as *Gonzalez,* 601 Fed. Appx. at 258-59) to the contrary. Critically, when asked if he considered race/ethnicity above communities of interest in creating his illustrative district, Ely testified "I did not make other considerations, so I can't say that I did it above something else. **It [race/ethnicity] was the sole consideration.**" Tr2: 112-13, 137. Thus, because Ely did not consider traditional districting principles such as communities of interest when creating his *Gingles* district but, instead, only considered his racial goal, he was unaware that his proposed district split numerous FISD communities of interest and boundaries such as neighborhoods and subdivisions, school attendance zones, congressional districts, and the small portion of the City of

---

[4] Notably, Plaintiff's expert Ely agrees that different socioeconomic statuses can effect cohesion within the aggregate group.  Tr2: 98.

DEFENDANTS' POST-TRIAL CLOSING BRIEF                                                                    PAGE 6
3088878

Plano located within FISD.[5] But his proposed district does. Tr2: 108-113; Tr3: 65, 69-77, 115-21; Defendants' Exhibit 4, 8, 9, 10, 11, 12, 13, 14. And, despite Ely's insistence otherwise, his illustrative district also splits census blocks as part of its gerrymandered, jagged edge shape. Tr3: 65, 73-74, 121, 141; Defendants' Exhibit 12. As stated by Defendant's expert Dr. Peter Morrison, "Mr. Ely has not only disregarded the communities of interest, but he has done so in a pervasive and egregious fashion." Tr3: 127-28.[6]

"Precedent thus indicates that if a proposed district is simply too bizarrely shaped because the minority population is dispersed in such a way that traditional districting criteria are barely considered, if at all, in drawing the district, it will be found to be non-compact for § 2 purposes." *Perez*, 253 F.Supp.3d at 917. Likewise, "[i]f [like here] race is the only 'common thread' that binds certain areas together, the district cannot be said to respect communities of interest." *Jindal*, 274 F.Supp.3d at 424. This should be this Court's finding in this case.

### 3.    Plaintiff Failed to Establish the Second *Gingles* Factor – Minority Political Cohesion

#### A. Plaintiff must show his minority coalition group votes cohesively.

"The minority group must also demonstrate that it is 'politically cohesive' to pass the *Gingles* threshold inquiry." *LULAC v. Clements,* 986 F.2d 728, 743 (5th Cir. 1993). "The notion of political cohesiveness contemplates that a specified group of voters shares common beliefs, ideals, principles, agendas, concerns, and the like such that they generally unite behind or coalesce around particular candidates and issues." *Id.* at 744. Here, that minority group is an alleged

---

[5] Moreover, Ely agrees that consulting the available socioeconomic data can be relevant to respecting traditional districting principles. However, Ely intentionally did not consult the relevant socioeconomic data regarding FISD residents to confirm that his illustrative district reflects that socioeconomic data. Tr2: 108. Still further, Ely did not attempt to determine whether or not his proposed district could ultimately comply with Texas law (it cannot), which is another traditional districting principle. Tr2: 103, 130; Tr3: 126-27. See, e.g., *Benavides*, 638 F.Supp.2d at 614 (illustrative districts must, *inter alia*, "comply with legal requirements").

[6] The bizarre shape of Ely's illustrative district, including that it stretches from the extreme north of FISD to the extreme south, is further evidence that race/ethnicity predominated over all other factors.

coalition of Asians, Blacks, and Hispanics residing in FISD. See Dkt. 81, ¶ 47; Tr2: 5, 91-92, 103, 135-36.

**B. Minority coalition claims are extraordinarily difficult to prove. The Plaintiff must prove Hispanic, African American, and Asian voters are indeed "one."**

The Fifth Circuit has "allow[ed] aggregation of different minority groups where the evidence suggests that they are politically cohesive." *Clements,* 999 F.2d at 864. However, as Judge Jones wrote in the en banc *Clements* concurring opinion, "[t]o be sure, the problem of determining minority political cohesiveness under *Gingles* may be difficult even when the claims of one minority group are at issue. But it should be self-evident that the problem is compounded when different minority groups, with radically different cultural and language backgrounds, socioeconomic characteristics and experiences of discrimination seek Section 2 coalition status." *Id.* at 896-97 (Jones, concurring, joined by Jolly, Smith, Barksdale and DeMoss).

According to Judge Jones' concurrence, "[t]he only proper test for minority aggregation is whether two minority groups [or, here, three] 'are indeed one'." *Id.* (quoting *Nixon v. Kent County, Michigan,* 790 F.Supp 738, 743 (W.D. Mich. 1992)). Thus, in analyzing an alleged minority coalition, the court should look to the following factors: "(1) whether the members have similar socioeconomic backgrounds resulting in common social disabilities and exclusion; (2) whether members have similar attitudes toward significant issues affecting the challenged entity; (3) whether members have consistently voted for the same candidates; and (4) whether the minorities consider themselves 'one' even in situations in which they would benefit independently." *Id.* at 897, n. 50. "A finding of political cohesiveness should require such coalitions to prove, at the very minimum, not only that they usually vote for the preferred candidates of their own ethnic group but also for those of the coalition group – otherwise, the groups cannot be politically cohesive." *Id.* at 897.

"Of course, if one part of the group cannot be expected to vote with the other part, the combination is not cohesive. If the evidence were to show that the Blacks vote against a Hispanic candidate, or vice versa, then the minority group could not be said to be cohesive." *Campos v. Baytown,* 840 F.2d 1240, 1245 (5th Cir. 1988). Thus, as opined by the Fifth Circuit in dismissing an ill-fated attempt to assert a three minority group coalition claim, "[a]s the district court recognized in this case, the determinative question is whether black-supported candidates receive a majority of the Hispanic and Asian vote; whether Hispanic-supported candidates receive a majority of the black and Asian vote; and whether Asian-supported candidates receive a majority of the black and Hispanic vote in most instances in the [FISD] area." *Brewer v. Ham,* 876 F.2d 448, 453 (5th Cir. 1989).

## C.  The evidence at trial shows Plaintiff failed to establish minority political cohesion

Here, the evidence at trial showed a lack of political cohesion among the minority group at issue here – a coalition of Asian, Black, and Hispanic voters in FISD.

First, the majority of Black voters did not vote for the Asian supported candidate in five of the seven endogenous FISD school board elections analyzed by Dr. Mayer. In other words, a majority of Black voters in FISD do not usually[7] vote for the Asian candidate. Tr3: 4-8, 177-81; Tr4: 3-4; Plaintiff's Exhibit 6 (Tables 11, 13, 15, 17, 19). And, more Hispanic voters voted for the white candidates than the Asian candidate in five of these seven FISD school board elections. In other words, a majority of Hispanics in FISD do not usually vote for the Asian candidate. Tr3: 8-11, 171-81; Tr4: 3-4; Plaintiff's Exhibit 6 (Tables 7, 11, 13, 15, 17, 19). Compare *Brewer*, 876

---

[7] According to Webster's.com dictionary, "usually" is defined as "most often or as a rule." Tr3: 44-45. In analyzing the *Gingles* three part test, "the import of the word 'usually' cannot be underestimated." *Campos v. City of Houston,* 894 F.Supp. 1062, 1066 (S.D. Tex. 1995). The dictionary definition of "usually" means "according to the usual or ordinary course of things; most often; as a rule." http://www. Merriam-Webster.com/dictionary/usually. "Usually" is an adverb "used to describe what happens or exists most of the time or in most cases." http://www.learnersdictionary.com/definition/usually. Thus, if an event occurs 50% of the time, it does not occur "usually" because it does not occur "in most cases." *Campos,* 894 F.Supp. at 1066.

F.2d at 453 (in a coalition group Voting Rights Act case, "the determinative question is whether... Asian-supported candidates receive a majority of the Black and Hispanic vote in most instances in the [FISD] area."). These election results show a lack of political cohesion among these three minority groups: the Asian supported candidates did not receive a majority of either the Black or the Hispanic vote in most instances in FISD.

Likewise, in the two FISD elections involving Hispanic candidates analyzed by Dr. Mayer, in neither election did a majority of Black voters vote for the Hispanic candidate. In other words, a majority of Black voters in FISD do not usually vote for the Hispanic candidate. And, related, a majority of Asian voters in FISD did not vote for the Hispanic candidate in either of the two elections in which a Hispanic ran. In other words, a majority of Asian voters in FISD do not usually vote for the Hispanic candidate. Tr3: 11-12; Plaintiff's Exhibit 6 (Tables 15, 19). Compare *Campos*, 840 F.2d at 1245 ("If the evidence were to show that the Blacks vote against a Hispanic candidate, or vice versa, then the minority group could not said to be cohesive."). These results again confirm a lack of minority group political cohesion in this case.

Summarizing these seven endogenous elections, and confirming a lack of minority political cohesion in FISD, in only one of the seven FISD elections did a majority of all three minority groups vote for the same candidate, and in only three of the seven elections did a plurality of all three minority groups vote for the same candidate. TRE3: 12. In the FISD school board elections Dr. Mayer reviewed, the three minority groups chose the same candidate only 43% (less than half) of the time and, as Dr. Mayer admitted, the three minority groups preferred different candidates in FISD elections "even under the plurality standard." Tr3: 46. This does not meet the "usually" requirement.

The FISD elections analyzed by Dr. Mayer do not show political cohesion between Asians, Blacks, and Hispanics in FISD – in fact, these elections show a *lack* of political cohesion.

Strikingly, the data analyzed by Dr. Mayer does not even show consistency **within** each of the racial groups that make up Plaintiff's purported coalition. A prime example is Hispanic voting patterns in endogenous FISD elections. In the FISD 2015 Place 7 election, Hispanic voters split their vote in a virtual tie between the white (35.1%), Hispanic (33.5%) and Asian (31.4%) candidates, with the white candidate receiving a plurality of the vote. In the FISD 2016 Place 2 election, Hispanic voters again almost evenly split their votes among the Asian (31.4%), Hispanic (37.3%), and white (31.3%) candidates. And, in the FISD 2017 Place 4 election, Hispanic voters **again** evenly split their votes between the incumbent white candidate (34.2%), a white challenger (32.6%) and an Asian challenger (33.3%). This data shows that Hispanic voters are not cohesive **within their own group**, let alone cohesive with Asian and Black voters. See Tr3: 177-80; Tr4: 3-4; Plaintiff's Exhibit 6.

Moreover, the four (less probative) exogenous elections selected by Dr. Mayer (as well as the U.S. Senate general election he suspiciously chose not to select) likewise show a complete lack of political cohesion among these three minority groups in FISD. As concluded by professor Dr. John Alford, these exogenous elections show "there's not a racial coalition here that's voting cohesively for the minority candidates." Tr3: 13-15; Tr4: 5-9; Plaintiff's Exhibit 6 (Tables 21, 24, 25).

As stated above, "[t]he notion of political cohesiveness contemplates that a specified group of voters shares common beliefs, ideals, principles, agendas, concerns, and the like such that they generally unite behind or coalesce around particular candidates and issues." *Clements,* 986 F.2d at 744. See also *Clements,* 999 F.2d at 896-97 ("The only proper test for minority aggregation is

whether two minority groups [or, here, three] 'are indeed one.'"). Here, tellingly, Plaintiff's political scientist expert, Dr. Mayer – after acknowledging that a proper analysis of the second *Gingles* factor (political cohesion) can include the socioeconomic factors he included in Table 30 of his report -- declined to offer an opinion on any common bond that Asians, Blacks, and Hispanics share in common in FISD and, similarly, he declined to express an opinion on any issues in FISD that these three minority groups have collectively united or coalesced behind. Tr3: 15, 18, 39.[8] Former FISD school board candidate Shirvaikar (an Asian Indian), however, was more direct: she testified that in her experience the Asian community in FISD is not "one" with either the Black or Hispanic communities in FISD. Tr4: 116-17.

In conclusion, the evidence at trial conclusively shows that the minority group at issue here – a coalition of Asian, Black, and Hispanic voters in FISD – is not politically cohesive. As a result, Plaintiff has failed to satisfy his burden under the second *Gingles* threshold factor. Tr4: 20-21. The Court may therefore end its analysis here.[9]

## 4.    Plaintiff Failed to Establish the Third *Gingles* Factor – White Bloc Voting

### A.  The Plaintiff must prove voting in FISD is racially polarized.

"The term racially polarized voting [as opposed to political cohesiveness] describes an electorate in which white voters favor and vote for certain candidates or propositions, and minority voters vote for other candidates or propositions. Thus, while a showing of racially polarized voting will frequently demonstrate that minority voters are politically cohesive, a showing that minority

---

[8] By way of example, Dr. Mayer conceded that Asians in FISD do not share an issue with limited English in common with Blacks. Tr3: 18.

[9] And, as discussed *supra*, a lack of cohesion among Plaintiff's chosen groups means Plaintiff cannot satisfy the first *Gingles* precondition – remove one minority group, and the illustrative district fails the 50% bright-line test.

voters are politically cohesive will not, by itself, establish racially polarized voting." *Clements,* 986 F.2d at 744.

**B. The Plaintiff cannot show a Voting Rights Act violation if partisan politics, not race, is the cause of the defeat of the minority preferred candidate.**

Critical to the Court's analysis of the third *Gingles* factor in this case, "failures of a minority group to elect representatives of its choice that are attributable to 'partisan politics' provide no grounds for relief. …We conclude that the district court clearly erred in finding dilution. The undisputed facts indicate that partisan affiliation, not race, caused the defeat of the minority-preferred candidate." *Clements,* 999 F.2d at 854, 891.

The following statement by the court in *LULAC v. Abbott* is informative: "The facts alleged by Plaintiffs, therefore, strongly implicate the conclusion that the relevant bloc frustrating Plaintiffs' election success is not whites but Republicans. As the Fifth Circuit has recognized, "[t]here is… a powerful argument supporting a rule that plaintiffs, to establish legally sufficient racial bloc voting, must prove that their failure to elect representatives of their choice cannot be characterized as a mere euphemism for political defeat at the polls, or the result of partisan politics." *LULAC v. Abbott,* 2019 U.S. Dist. Lexis 29821, * 28-29 (W.D. Tex. 2019) (quoting *Clements,* 999 F.2d at 859).

**C. The evidence at trial shows Plaintiff failed to show white bloc voting in FISD**

Here, the evidence at trial showed first that, until the early 2000's, FISD was a small school district in a non-diverse rural community with an Asian student population of 0% and an African American student population of 2.7%. These factors, which are unrebutted, explain the apparent lack of minority election success until the 2000's. Tr4: 37, 65, 99-100; Plaintiff's Exhibit 114.

More importantly, the evidence shows that the results of FISD's school board elections over the last decade are driven not by ethnicity or race, but instead by ultra conservative Tea Party-

type fiscal politics and policy disputes involving school bonds and taxes. By way of example, in the May 2019 FISD elections, in mirror image contests, the moderate white candidate (Rudy) defeated the Tea Party backed Asian candidate (Janagarajan), while in the other contest the moderate Asian candidate (Ponangi) defeated the Tea Party backed white candidate (Adams). Further, former candidate Anjali Shirvaikar, who is Asian Indian, directly attributed her defeat to Tea Party politics, testifying that the Tea Party campaigned against her because "I am not very conservative when it comes to finances. I believe in paying taxes." In FISD school board elections, it is partisan fiscal politics that matters, not race or ethnicity. Tr1: 34-35, 49-50, 100-02, 112-13, 119-20, 181-86, 195-96, 203-04; Tr2: 8-9, 19-21; Tr4: 6-8, 21, 70-73, 76-78, 84-88, 111-15, 122, 159-161, 167; Defendants' Exhibit 15. Notably, Plaintiff's expert Dr. Mayer did not, and could not, discount partisan fiscal politics as the reason for the results of FISD's school board elections. Tr2: 89-90, 191-92; Tr3: 15, 41-42.

The evidence at trial shows that Plaintiff did not meet his burden to rebut Defendants' evidence that the results of FISD's school board elections are the result of partisan fiscal politics. As a result, he has failed to meet the third threshold inquiry required by *Gingles*.

**5.      Plaintiff Failed to Establish the New, Additional Factor Announced by the Fifth Circuit in *Harding v. County of Dallas***

In *Harding v. County of Dallas,* Judge Ho, in his concurring opinion, set forth the Supreme Court's recent changes to the *Gingles* voting rights framework:

> In *Abbott v. Perez,* 138 S.Ct. 2305, 201 L. Ed. 2d 714 (2018), the Supreme Court increased the evidentiary burden on plaintiffs in vote dilution cases under Section 2 of the Voting Rights Act. …
>
> For decades, the Supreme Court has applied a two-pronged test to assess vote dilution claims under Section 2 of the Voting Rights Act, 52 U.S.C. § 10301. [citing *Gingles*]. First, the plaintiff must satisfy three threshold conditions, commonly known as the *Gingles* factors… Second, if the plaintiff satisfies all three *Gingles* factors,

she must then demonstrate that vote dilution has occurred under the totality of circumstances test set forth by the Court – in essence, whether a history of racial discrimination exists in the relevant jurisdiction. …

*Perez* alters this framework. In addition to the three *Gingles* factors, plaintiffs must survive an additional inquiry before reaching the totality of the circumstances test. Plaintiffs must now affirmatively prove that the minority group will have a "real" opportunity to elect representatives of its choice. *Perez,* 138 S.Ct. at 2333.

So after *Perez,* it is no longer enough for plaintiffs to draw a proposed district that satisfies the *Gingles* factors. It must additionally prove that the proposed district will in fact perform as plaintiffs hope.

This performance requirement is new….

948 F.3d 302, 315-16 (5th Cir. 2020) (Ho, concurring and dissenting).

Here, the evidence at trial showed that, according to the two simulated "notional outcome" elections in Ely's proposed illustrative district, the outcomes of the FISD May 2015 Place 7 and May 2019 Place 3 elections – elections in which the white candidate defeated the minority candidates – *would not change* if those same elections occurred in Ely's proposed illustrative district. Tr3: 18-20, 43-44; Plaintiff's Ex. 65 and 68. Further, the simulated exogenous election in the illustrative district conducted by Plaintiff's expert Dr. Mayer likewise confirms that the minority candidate would still lose to the white candidate if that election occurred in Ely's illustrative district. Tr4: 10-11; Defendants' Ex. 1, p. 22; Plaintiff's Exhibit 6 (Table 29).

Thus, as the simulated elections discussed at trial show, Plaintiff has failed to meet his burden, as articulated by Judge Ho in *Harding*, to "prove that the proposed district will in fact perform as [Plaintiff Kumar] hope[s]." 948 F.3d at 316. Accordingly, this Court may end its inquiry and dismiss Plaintiff's claims at this stage of the analysis, without the need to reach the totality of the circumstances test. *Id.*

**6.      The Totality of the Circumstances Favor Maintaining FISD's At-Large System**

"Satisfaction of [*Gingles'*] three 'preconditions,' is necessary, but not sufficient to establish liability under § 2. Plaintiffs must also show that, under the 'totality of circumstances,' they do not possess the same opportunities to participate in the political process and elect representatives of their choice enjoyed by other voters." *Clements,* 999 F.2d at 849.

The "totality of circumstances" (or Senate Factors) include the following factors: (1) the history of voting-related discrimination in the political subdivision (here, FISD); (2) the extent to which voting in the elections of the political subdivision is racially polarized; (3) the extent to which the political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group; (4) the extent to which the minority group members bear the effects of past discriminations in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; (5) the use of overt or subtle racial appeals in political campaigns; (6) the extent to which members of the minority group have been elected to public office in the jurisdiction; (7) evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group, (8) evidence that the policy underlying the political subdivision's use of the contested practice or structure is tenuous, and (9) whether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant areas. *Id.* at 849, n. 22; *Fairly v. Hattiesburg,* 662 Fed. Appx. 291, 295-96 (5th Cir. 2016); *Lopez v. Abbott,* 339 F.Supp.3d 589, 602 (S.D. Tex. 2018).

Although there are nine factors discussed by the courts, the totality of the circumstances factors list "is not exhaustive, and 'there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other.' Moreover, 'not every factor will

be relevant in every case.' Rather, the proper assessment of vote dilution claims is peculiarly dependent upon the facts of each case and requires an intensely local appraisal of the design and impact of the contested electoral mechanisms." *Fairly*, 662 Fed. Appx. at 296. "[T]he totality of the circumstances inquiry is not an empty formalism, and satisfying the *Gingles* preconditions does not necessitate liability. To the contrary, this final inquiry can be powerful indeed." *Id.*

"The totality of circumstances test is the means by which the inference of vote dilution [*Gingles* second and third factors] may be rebutted or cemented." *Lopez,* 339 F.Supp.3d at 602. Here, the totality of circumstances rebut any inference of vote dilution, and favor maintaining FISD's at-large system.

First, with respect to FISD's local history, the evidence at trial showed that, until the early 2000's, FISD was a small school district in a non-diverse rural community with an Asian student population of 0% and an African American student population of 2.7%. These factors, not voting-related discrimination, explain the apparent lack of minority election success until the 2000's. Tr4: 37, 65, 99-100; Plaintiff's Exhibit 114.

Further, there is simply no evidence of voting-related (or other) discrimination in FISD, nor is there evidence of overt or subtle racial appeals in FISD political campaigns or that voting in FISD is racially polarized.[10]   To the contrary, the Asian, Black, and Hispanic witnesses at trial testified about a **lack** of discrimination or prejudice in FISD. Tr4: 16-20, 22, 115-16, 122-23, 161. By ways of example, Marc Payne, a Black FISD resident, testified that "Frisco ISD is a great place… I am very glad that we moved to Frisco or Frisco ISD…. I think [FISD] is a great school system." Tr1: 132, 137. Anjali Shirvaikar, an Asian Indian FISD resident, testified that FISD "did a spectacular job" in educating her children, "so no prejudice, no discrimination, but definitely the

---

[10] The lack of racially polarized elections is more fully detailed in the discussion of second and third *Gingles* factors *supra.*

kids have been supported." Tr4: 109-10, 116. Geneva Polster, a Hispanic FISD resident, testified "we thought that FISD was the best district to raise our kids in … the district did an amazing job of educating my children. I am a huge fan of Frisco ISD." Tr4: 119-21.[11] Witnesses from each minority group testified that they supported FISD's at-large election system and that it "works very well." Notably, other than Plaintiff Kumar's complaint in this lawsuit, FISD has not had any complaints from the community about its at-large election system. Tr1: 85, 119, 168; Tr4: 63, 90, 97, 116, 123, 162.

Moreover, the evidence at trial showed that FISD's school board has routinely been responsive to the needs of the school district's fast-growing minority community. By ways of example, FISD is "very supportive" and "has had a positive relationship" with the minority community organization One Voice, which was organized to "educate minority parents on all the opportunities that were available within FISD to help students" and to increase diversity within FISD. Notably, One Voice started as a "*partnership with FISD* to look at educational disparities between people of color" and has been continuously "sponsored" by FISD, including FISD participating in One Voice community events such as job fairs. According to one of the founders of One Voice, Marie Walters, One Voice's work with FISD has improved test scores for minorities and has "had a positive impact on educational outcomes for students of color in Frisco ISD." According to another founder of One Voice, Peter Burns, "the district was very supportive of us in [One Voice's mission] and we were able to put together basically *a partnership* of being able to reach parents throughout the district." One Voice's participation with FISD has "absolutely" been

---

[11] See also Plaintiff's Second Amended Complaint, which alleges "[i]n 2014, the same year that [Plaintiff's] family moved to FISD, The Dallas Morning News reported that Frisco schools' strong academic reputation was drawing families in India and other parts of the United States 'in droves.' The article noted that even from India, families were aware that Frisco had good schools, large homes, and a Hindu temple planned (that has since been built.)" Dkt. 81, ¶ 12.

successful. Tr1: 66, 69, 71-72, 74, 78, 84-85, 123-24, 149-52, 169-70, 172-73; Tr4: 100-02, 157-59, 162; Plaintiff's Exhibits 60, 61. As another example of responding to its community, FISD's school board has created a long-standing diversity task force comprised of community members, parents, students, teachers and administrators to identify and assist in meeting minority needs. Tr4: 39-40, 78-79, 97-100, 116. Still further, the evidence at trial showed the FISD board has been responsive to the needs of its (few) underperforming, economically disadvantaged schools, including Bright Elementary, now called Bright Academy, which has become a model for other campuses and now has a waiting list to attend. Tr4: 62-63, 89-90. The FISD school board actively and meaningfully responds to the needs of the school district's minority community.

Next, the evidence at trial affirmatively shows that Asians, Blacks, and Hispanics in FISD do **not** bear the effects of any past discrimination in areas such as education, employment, and health which hinder their ability to participate effectively in the political process.[12] According to Table 30 Dr. Mayer's report (Plaintiff's Exhibit 6), Asian voters have the highest household and family income of any group in FISD, including white voters, and have "a stunning level" of education – i.e., Asian voters in FISD are not suffering discrimination based on income or education (or health). Asian voters are closer to whites than Blacks or Hispanics in FISD, and Asians are better off than whites in a majority of Table 30's socioeconomic metrics. Other than English proficiency, Asians in FISD are better off than whites in the Senate Factor concerning the effects of discrimination in areas such as education, employment and health which hinder their

---

[12] Importantly, with respect to this Senate Factor, "[t]estimony regarding depressed political participation relevant to a local election must be grounded in a *local* appraisal of the facts." *Fairly*, 662 Fed. Appx. at 298. Thus, courts should reject expert testimony that "individuals of lower socioeconomic status were not as likely to vote as individuals of higher socioeconomic status" when it is not based on "an intensely local appraisal of the social and political climate." *Id.* (quoting *Clark v. Calhoun Cty.*, 88 F.3d 1393, 1399 (5th Cir. 1996)). Dr. Mayer did not undertake this "intensely local" analysis in this case (see e.g., Tr2: 191-92), and his testimony on this Senate Factor should therefore be rejected.

ability to participate effectively in the political process.[13] Further, Blacks in FISD are also well-off and have characteristics "that we would expect to be associated with relatively high turnout or certainly with turnout not much different than white turnout." Nothing in Table 30 shows that Asians' or Blacks' or Hispanics' socioeconomic conditions are the result of past discrimination and inhibit these groups from participating in FISD elections. Tr3: 3, 15-18, 37-39, 42-43; Tr4: 13-18; Plaintiff's Exhibit 6 (Table 30).   FISD has a prosperous, healthy, and educated minority community.

Educationally, FISD is one of the highest ranked and highest performing school districts in the State of Texas, with an "A" accountability rating. According to the most recent Texas Academic Performance Report, FISD's minority students, particularly Asian students, perform higher than the State averages in all academic course levels. Tr1: 89-91; Tr4: 41, 46-47; Defendants' Exhibit 17. Related, out of the 118 independent school districts in the Dallas-Fort Worth area, FISD ranks fourth in the STARR state test passage rate – FISD's STARR passage rate is 93.4%, while the state average is only 71.7%. This is a quality of life indicator, meaning the quality of life for minorities in FISD is good. Tr3: 77-79; Plaintiff's Exhibit 131. Also, FISD has the lowest percentage of disadvantaged students of any school district with more than 20,000 students in Texas. As an example, only 12.03% of FISD students are in the free lunch program while the state-wide average is 60.26%. This is also a quality of life indicator, meaning again that the quality of life for minorities in FISD is good. Id.

Finally, the policy underlying FISD's at-large system is not tenuous but, rather, well-founded. Tr4: 68-69, 90-91.

---

[13] Table 30 from Dr. Mayer's report shows that while Blacks and Hispanics may be somewhat disadvantaged socioeconomically relative to white voters, these two groups are also disadvantaged relative to Asian voters (who have the advantage over whites). Tr3: 39.

For these reasons, the totality of the circumstances in this case rebut any inference of vote dilution, and favor maintaining FISD's at-large system for electing its board of trustees.

**7.     There is No Evidence of the Discriminatory Intent Required for Plaintiff's Constitutional Claims**

In addition to his Voting Right Act claim, Plaintiff also alleges causes of action under the Fourteenth and Fifteenth Amendments to the U.S. Constitution. Dkt. 81, ¶¶ 59-66.

To prevail under a Fourteenth or Fifteenth Amendment claim of vote dilution, proof of racially discriminatory intent is required. *Nevett v. Sides,* 571 F.2d 209, 219-20 (5th Cir. 1978). The required elements are (1) intentional discrimination against a group, and (2) an actual discriminatory effect resulted. *Brown v. City of Shreveport*, 1998 U.S. App. Lexis 39629, * 2 (5th Cir. 1998); *LULAC v. North E. Indep. Sch. Dist.*, 903 F.Supp. 1071, 1093 (W.D. Tex. 1995). However, "[i]t is unclear whether the Fifteenth Amendment applies to vote dilution claims, and, if so, to what extent." *LULAC,* 903 F.Supp. at 1093; see also *Lopez v. City of Houston,* 2009 U.S. Dist. Lexis 43430, * 61 n.44 (S.D. Tex. 2009).[14] In fact, according to the Fifth Circuit, "[i]ndeed, the Supreme Court has rejected application of the Fifteenth Amendment to vote dilution causes of action." *Prejean v. Foster,* 227 F.3d 504, 519 (5th Cir. 2000) (citing *Reno v. Bossier Parish Sch. Bd.,* 528 U.S. 320, 120 S. Ct. 866, 875, n.3, 145 L.Ed.2d 845 (2000)).

Regardless, even assuming the Fifteenth Amendment does apply to vote dilution cases, there was **no evidence** at trial of any intentional discrimination against any FISD voting minority group.  See Tr4: 22, 115, 133-23, 161, 167. Nor was there evidence of resident complaints to the FISD school board about the board's election system, including complaints about any alleged discrimination in the voting process. Tr4: 63, 90, 97. This lack of evidence of any intentional

---

[14] "This Court has not decided whether the Fifteenth Amendment applies to vote-dilution claims; in fact, we have never held any legislative apportionment inconsistent with the Fifteenth Amendment." *Voinovich v. Quilter,* 507 U.S. 146, 159, 113 S. Ct. 1149, 122 L.Ed.2d 500 (1993).

discrimination in FISD is fatal to Plaintiff's constitutional claims: the first element of a viable
constitutional claim is intentional discrimination.

Moreover, Plaintiff's failure in this case to show a Section 2 Voting Rights Act claim (see
*supra*) "also forecloses" his ability to obtain relief under the "more rigorous" standard under both
the Fourteenth and Fifteenth Amendments, which require proof of all the elements of a successful
Section 2 claim and then, additionally, discriminatory intent. E.g., *Lopez,* 2009 U.S. Dist. Lexis
43430 at *61-66 (holding "the Plaintiffs' failure to state a viable § 2 claim also foreclosures their
ability to obtain relief under the [Fourteenth and Fifteenth Amendments]"); *Harding v. County of
Dallas,* 336 F.Supp.3d 677, 701 (N.D. Tex. 2018) (holding that "given Plaintiffs' failure in this
case to prove that the 2011 Map actually diluted their voting strength, their [Fourteenth
Amendment] claim must fail"). Here, the evidence at trial shows there is no actual discriminatory
effect on the minority coalition group at issue as a result of FISD's at-large electoral system.
Plaintiff's constitutional claims should therefore be dismissed for this additional reason: the failure
to prove the second element of a viable constitutional claim.

**8.      Plaintiff's Expert's Testimony Regarding the *Gingles* Second and Third Factors is
         Based on Unreliable Underlying Data**

Finally, notwithstanding the above analysis, the Court should also dismiss Plaintiff's
claims because Plaintiff did not present reliable evidence in support of the required *Gingles* second
and third factors. More specifically, the underlying methodology used to create the voter database
used by Plaintiff's expert Dr. Mayer is unreliable because it is based on unreliable Asian surname
lists rather than reliable census data. Of course, a court should exclude the testimony of an expert
if it is not reliable. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 149 (1999); *Daubert v. Merrell
Dow Pharms., Inc.,* 509 U.S. 579, 592-93 (1993). An expert witness may be qualified and highly
credible, but his conclusions may be based on unreliable methodology. Opinions based on

unreliable methodology and/or data is no more than "subjective belief or unsupported speculation." *Daubert,* 509 U.S. at 590. "This gate-keeping obligation applies to all types of expert testimony, not just scientific testimony." *Pipitone v. Biomatrix, Inc.,* 288 F.3d 239, 244 (5th Cir. 2002).

For the expert's testimony to be reliable, the following requirements must be met: (1) the testimony must be based on sufficient facts or data, (2) the testimony must be the product of reliable principles and methods, and (3) the expert must reliably apply the principles and methods to the facts of the case. Fed. R. Evid. 702.

In *Daubert,* the Supreme Court offered the following non-exclusive list of factors that courts may use when evaluating the reliability of expert testimony: (1) whether the expert's theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication[15]; (3) the known or potential rate of error of the challenged method; and (4) whether the theory or technique is generally accepted in the relevant scientific community. *Daubert,* 509 U.S. at 593-94; *Pipitone,* 288 F.3d at 244.

Here, demographer Ely correctly used census data to identify Hispanics, Asians, and Blacks to create his illustrative district. However, rather than also using reliable, court-approved census data based on ethnic self-identification to create the voter database for Dr. Mayer to use (which Ely could have done), Ely instead used an unconventional "hybrid" methodology to estimate the ethnicity of FISD voters – a method that has not been published, has not been peer reviewed, and has never been successfully used in a voting rights case involving either Asian plaintiffs or a coalition of more than two minority groups.[16] Here, instead of just using census data

---

[15] The peer review factor "may be particularly important where [like here] conclusions have been drawn solely for purpose of litigation." *Raynor v. Merrell Pharms.,* 104 F.3d 1371, 1375 (D.C. Cir. 1997).

[16] Despite relying on the accuracy/reliability of the voter database prepared by Ely, Dr. Mayer did not have any substantive conversations with Ely about how Ely created the database. Mayer did nothing to verify or check the accuracy of Ely's data. Tr2: 188-90.

like he did to create his illustrative district, Ely used surnames for Hispanics and Asians from a list of registered voters and then combined that analysis with census and American Community Survey (ACS) CVAP data for Blacks and whites to create the database for Mayer to use to render his opinions on the second and third *Gingles* factors. However, the Asian surname lists used by Ely have "severe limitations" and a high rate of error (for example, there is only a 60-64% rate of accuracy for properly identifying Asian Indians) and should be considered unreliable. Tr2: 33, 67, 92-98, 100-02, 155, 188-91; Tr3: 102-14, 166-71; Plaintiff's Exhibit 1, Appendix B thereto. Because of the unreliability of using such surname data, the Fifth Circuit has stated "Spanish-surname data are disfavored, and census data based upon self-identification provides the proper basis for analyzing Section 2 vote dilution claims in the future." *Rodriguez v. Bexar County,* 385 F.3d 853, 867 n. 18 (5th Cir. 2004); *see also Rodriguez v. Harris County, Texas,* 964 F.Supp.2d 686, 736 (S.D. Tex. 2013). Based on Appendix B to the Ely report, Asian surname data is even more unreliable than Spanish surname data and should be even more "disfavored." Ely's database based on Asian surname lists is unreliable.

Because his opinion is based on a database created by using an unproven, unreliable methodology, Plaintiff's expert testimony in support of the second and third *Gingles* factors should be excluded and disregarded since it is no more than "subjective belief or unsupported speculation." This is no evidence, and Plaintiff has therefore failed to meet his burden to prove the second and third *Gingles* factors for this additional reason.

Respectfully submitted,

**ABERNATHY, ROEDER, BOYD & HULLETT, P.C.**

*/s/Charles J. Crawford*
**Charles J. Crawford**
State Bar No. 05018900
**Chad Timmons**
State Bar No. 24060732
**Lucas C. Henry**
State Bar No. 24101901
1700 Redbud Blvd., Suite 300
McKinney, Texas 75069
Telephone: (214) 544-4000
Facsimile: (214) 544-4040
ccrawford@abernathy-law.com
ctimmons@abernathy-law.com
lhenry@abernathy-law.com

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of Defendants' Post-Trial Closing Brief was served upon Plaintiff's counsel by the Court's ECF service on July 9, 2020.

*/s/Charles J. Crawford*
Charles J. Crawford